Anna St. John (*pro hac vice* pending)
**COMPETITIVE ENTERPRISE INSTITUTE**
  **CENTER FOR CLASS ACTION FAIRNESS**
1310 L Street NW, 7th Floor
Washington, DC 20005
Voice: (917) 327-2392
Email: anna.stjohn@cei.org

Eric M. Lightman (SBN 288791)
**Law Offices of Eric M. Lightman**
1254 Mission Street
San Francisco, CA
Voice: (415) 295-4777
Email: eric.m.lightman@gmail.com

*Attorneys for Objector Joshua D. Holyoak*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM WILLIAMSON, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>    v.<br><br>MCAFEE, INC.,<br><br>                      Defendant.<br><br>SAMANTHA KIRBY, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br><br>    v.<br><br>MCAFEE, INC.,<br><br>    Defendant. | Case Nos. 5:14-cv-00158-EJD; 5:14-cv-02475-EJD<br><br>**OBJECTION OF JOSHUA D. HOLYOAK**<br><br><br>Date:         January 26, 2017<br>Time:        10:00 a.m.<br>Judge:      Hon. Edward J. Davila |

Case Nos. 5:14-cv-00158-EJD; 5:14-cv-02475-EJD

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... ii

TABLE OF AUTHORITIES ................................................................................................ iii

SUMMARY OF ARGUMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................ 2

    I.     Objector Holyoak is a member of the Auto-Renewal and Reference Price Classes, and intends to appear through counsel at the fairness hearing. ......................................... 2

    II.    The Court has a fiduciary duty to the absent class members. .................................... 3

    III.   Coupon settlements are disfavored and subject to heightened scrutiny. ................... 5

    IV.   There is no legitimate reason why this settlement does not issue direct payments to known, eligible class members. ....................................................................................... 9

    V.    The proposed settlement does not pass the Rule 23(e) fairness inquiry because it allows class counsel to obtain a disproportionate amount of the settlement proceeds ............... 12

    A.    Disproportionate attorneys' fees ............................................................................ 13

    B.    The clear sailing agreement ................................................................................... 18

    C.    The "kicker" clause / segregated fee fund .......................................................... 20

    D.    Inadequate representation ........................................................................................ 21

    VI.   In the alternative, if the Court approves the settlement, the Court should not award attorneys' fees until the coupon redemption rate is known. ........................................... 21

CONCLUSION ....................................................................................................................... 24

# TABLE OF AUTHORITIES

<u>Cases</u>

*Acosta v. Trans Union, LLC,*
   243 F.R.D. 377 (C.D. Cal. 2007) ...................................................................................11

*Allen v. Bedolia,*
   787 F.3d 1218 (9th Cir. 2015) ..........................................................................1, 13, 15

*Amchem Prods. Inc. v. Windsor,*
   521 U.S. 591 (1997) .......................................................................................................22

*In re Aqua Dots Prods. Liab. Litig.,*
   654 F.3d 748 (7th Cir. 2011) ........................................................................................21

*In re Baby Prods. Antitrust Litig.,*
   708 F.3d 163 (3d Cir. 2013) ..........................................................................................22

*In re Bluetooth Headset Prod. Liab. Litig.,*
   654 F.3d 935 (9th Cir. 2011)........................................2, 4, 5, 12, 13, 15, 17, 18, 19, 20, 22

*Boeing Co. v. Van Gemert,*
   444 U.S. 472 (1980) ..................................................................................................15-16

*Boyd v. Avanquest N. Am., Inc.,*
   No. 12-cv-04391, 2015 U.S. Dist. LEXIS 93458 (N.D. Cal. July 17, 2015) ...............18

*Burden v. Selectquote Ins. Servs.,*
   No. C 10-05966 SBA, 2013 U.S. Dist. LEXIS 16977 (N.D. Cal. Feb. 5, 2013) .......11

*In re Cmty. Bank of N. Va.,*
   418 F.3d 277 (3d Cir. 2005) ..........................................................................................21

*In re Compact Disc Minimum Advertised Price Antitrust Litig.,*
   292 F. Supp. 2d 184 (D. Me. 2003)...............................................................................24

*Dardarian v. OfficeMax N. Am., Inc.,*
   No. 11-cv-00947, 2014 U.S. Dist. LEXIS 178463 (N.D. Cal. Dec. 30, 2014) ............7

*Dardarian v. Officemax N. Am., Inc.,*
   No. 11-cv-00947, 2013 U.S. Dist. LEXIS 98653 (N.D. Cal. July 12, 2013) ...............8

*Davis v. Cole Haan, Inc.,*
   No. 11-cv-01826, 2015 U.S. Dist. LEXIS 153434 (N.D. Cal. Nov. 12, 2015)...........24

*Davis v. Cole Haan, Inc.,*
   No. C 11-01826, 2013 U.S. Dist. LEXIS 151813 (N.D. Cal. Oct. 21, 2013) .............7

*Deatrick v. Securitas Sec. Servs. USA,*
    No. 13-cv-05016, 2016 U.S. Dist. LEXIS 47916 (N.D. Cal. Apr. 7, 2016) .............................12

*Deatrick v. Securitas Sec. Servs. USA,*
    No. 13-cv-05016-JST, 2016 U.S. Dist. LEXIS 22597, (N.D. Cal. Feb. 24, 2016) ..................11

*De Leon v. Bank of Am.,*
    No. 6:09-cv-1251, 2012 U.S. Dist. LEXIS 91124 (M.D. Fla. Apr. 20, 2012) ..........................12

*Dennis v. Kellogg Co.,*
    697 F.3d 858 (9th Cir. 2012) ................................................................................4, 5, 13, 15

*In re Dry Max Pampers Litig.,*
    724 F.3d 713 (6th Cir. 2003) ............................................................................2, 3, 4, 17, 20

*Dugan v. Lloyds TSB Bank,*
    No. C 12-02549 WHA, 2014 U.S. Dist. LEXIS 60852 (N.D. Cal. Apr. 24, 2014).................15

*Etter v. Thetford Corp.,*
    No. 8:13-81, Dkt. 221 at 11 (C.D. Cal. Oct. 14, 2014) ........................................................21

*Figueroa v. Sharper Image Corp.,*
    517 F. Supp. 2d 1292 (S.D. Fla. 2007)...................................................................................6

*Fleury v. Richemont N. Am.,*
    No. C-05-4525, 2008 U.S. Dist. LEXIS 112459 (N.D. Cal. Aug. 6, 2008)..............................7

*Fouks v. Red Wing Hotel Corp.,*
    No. 12-CV-2160, 2013 U.S. Dist. LEXIS 165588 (D. Minn. Nov. 21, 2013)..........................23

*Fraser v. Asus Computer Int'l,*
    No. C 12-00652 WHA, 2012 U.S. Dist. LEXIS 181315 (N.D. Cal. Dec. 21, 2012) ..............12

*Gallego v. Northland Group Inc.,*
    814 F.3d 123 (2d Cir. 2016) .................................................................................................21

*Galloway v. Kan. City Landsmen,*
    833 F.3d 969 (8th Cir. 2016) ................................................................................................22

*Gascho v. Global Fitness Holdings,*
    822 F.3d 269 (6th Cir. 2016) ................................................................................................16

*In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995) ...........................................................................................4, 5, 12

*Hopson v. Hanesbrands,*
    No. CV-08-0488, 2009 U.S. Dist. LEXIS 33900 (N.D. Cal. Apr. 3, 2009) .......................16-17

*In re HP Inkjet Printer Litigation,*
    716 F.3d 1173 (9th Cir. 2013) ............................................................ 1, 6, 7, 8, 9, 22, 23

*In re HP Inkjet Litig.,*
    5:05-cv-3580, 2011 U.S. Dist. LEXIS 37446 (N.D. Cal. Mar. 29, 2011)................................. 7-8

*Int'l Precious Metals Corp. v. Waters,*
    530 U.S. 1223 (2000) ........................................................................................ 19

*Khatib v. County of Orange,*
    639 F.3d 898 (9th Cir. 2011) ................................................................................. 7

*In re Livingsocial Mktg. & Sales Practice Litig.,*
    298 F.R.D. 1 (D.D.C. 2013) ................................................................................ 14

*Lobatz v. U.S. W. Cellular of Cal., Inc.,*
    222 F.3d 1142 (9th Cir. 2000) ............................................................................. 21

*Manchouck v. Mondelez Int'l Inc.,*
    No. C 13-02148 WHA, 2013 U.S. Dist. LEXIS 80132 (N.D. Cal. June 3, 2013).............. 11-12

*McDonough v. Toys "R" Us,*
    80 F. Supp. 3d 626 (E.D. Pa. 2015) ...................................................................... 12

*In re Mercury Interactive Corp. Sec. Litig.,*
    618 F.3d 988 (9th Cir. 2010) ......................................................................... 3, 21-22

*In re Mexico Money Transfer Litig.,*
    267 F.3d 743 (7th Cir. 2001) ................................................................................ 6

*Monteferrante v. Container Store,*
    Civ. No. 13-11362, 2015 U.S. Dist. LEXIS 13212 (D. Mass. Feb. 4, 2015) .............................. 7

*In re Online DVD-Rental Antitrust Litig.,*
    779 F.3d 934 (9th Cir. 2015) ................................................................................ 8

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) ................................................................... 2, 13, 16, 17

*Polar Int'l Brokerage Corp. v. Reeve,*
    187 F.R.D. 108 (S.D.N.Y. 1999) .......................................................................... 21

*Radcliffe v. Experian Info. Solutions,*
    715 F.3d 1157 (9th Cir. 2013) ............................................................................. 21

*In re Razorfish, Inc. Sec. Litig.,*
    143 F. Supp. 2d 304 (S.D.N.Y. 2001) .................................................................... 21

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th 2014)..............................................................................13, 18, 19, 23

*Richardson v. L'Oreal USA, Inc.*,
    991 F. Supp. 2d 181 (D.D.C. Nov. 6, 2013) ..............................................................3

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ...................................................................................21

*Rougvie v. Ascena Retail Group, Inc.*,
    No. 15-cv-00724, 2016 U.S. Dist. LEXIS 99235 (E.D. Pa. July 29, 2016) ...............23

*Rubio-Delgado v. Aerotek, Inc.*,
    No. 13-cv-03105-SC, 2015 U.S. Dist. LEXIS 75300 (N.D. Cal. June 10, 2015) ......11

*Smith v. Levine Leichtman Capital*,
    No. C 10-00010 JSW, 2012 U.S. Dist. LEXIS 163672 (N.D. Cal. Nov. 15, 2012) ......11

*Sobel v. Hertz Corp.*,
    No. 3:06-cv-00545, 2011 U.S. Dist. LEXIS 68984 (D. Nev. June 27, 2011)....... 7, 8, 19, 22, 23

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................................ 13, 19

*Strong v. Bellsouth Telecomms. Inc.*,
    137 F.3d 844 (5th Cir. 1998) ................................................................................ 16, 20

*Sullivan v. DB Investments*,
    667 F.3d 273 (3d Cir. 2011) ...................................................................................14

*Synfuel Techs. v. DHL Express (USA)*,
    463 F.3d 646 (7th Cir. 2006)..................................................................................6, 17

*In re Transpacific Passenger Air Transp. Antitrust Litig.*,
    No. C 07-05634, 2015 U.S. Dist. LEXIS 67904 (N.D. Cal. May 26, 2015)...............14

*True v. Am. Honda Motor Co.*,
    749 F. Supp. 2d 1052 (C.D. Cal. 2010)................................................................5, 6, 7, 8, 9

*Vought v. Bank of Am.*,
    901 F. Supp. 2d 1071 (C.D. Ill. 2012).....................................................................19

*Weinberger v. Great N. Nekoosa Corp.*,
    925 F.2d 518 (1st Cir. 1991)................................................................................. 18, 19

*In re Wells Fargo Sec. Litig.*,
    157 F.R.D. 467 (N.D. Cal. 1994) ............................................................................14

*Williams v. MGM-Pathe Comms. Co.,*
    129 F.3d 1026 (9th Cir. 1997) .................................................................16


Rules and Statutes

Fed. R. Civ. P. 23 ......................................................................................... 16, 22

Fed. R. Civ. P. 23(a) ............................................................................................ 4

Fed. R. Civ. P. 23(b)(2) ..................................................................................... 18

Fed. R. Civ. P. 23(e) ..............................................1, 2, 4, 12, 13, 16, 17, 18, 22, 24

Fed. R. Civ. P. 23(g)(4) ..................................................................................... 21

Fed. R. Civ. P. 23(h) ......................................................................................... 23

28 U.S.C. § 1712 ...............................................................................6, 9, 13, 23

28 U.S.C. § 1712(a) .....................................................................................6, 9

28 U.S.C. § 1712(c) ............................................................................................ 9

28 U.S.C. § 1712(e) ............................................................................................ 6

28 U.S.C. § 1711 note §§ 2(a)(3), (a)(3)(A) ................................................ 5-6


Other Authorities

Advisory Committee Notes to 2003 Amendments to Rule 23 .................................22

American Law Institute,
    *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010) .................................5

Brickman, Lester,
    LAWYER BARONS (2011) ...............................................................................20

Federal Judicial Center,
    *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010) .......... 10-11

Federal Judicial Center,
    *Manual for Complex Litigation* § 21.612 (4th ed. 2004) .....................................5

Fitzpatrick, Brian T.,
    *The End of Objector Blackmail?*,
    62 VAND. L. REV. 1623 (2009) ...................................................................3

Hantler, Steven B. & Norton, Robert E.
    *Coupon Settlements: The Emperor's Clothes of Class Actions*,
    18 GEO. J. LEGAL ETHICS 1343 (2005) .......................................................7

Henderson, William D.,
    *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*,
    77 TUL. L. REV. 813 (2003) .....................................................................19

Janowicz, Tiffany,
    Webinar, *Settlement Administration: Impacting Claims Filing Rates*....................14

Leslie, Christopher R.,
    *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation*,
    49 UCLA L. REV. 991 (2002) ...................................................................9

Liptak, Adam,
    *When Lawyers Cut Their Clients Out of the Deal*,
    N.Y. TIMES, Aug. 13, 2013.......................................................................3

MacLean, Pamela A.,
    "Dealing for Dollars: Objectors allege that claims-made settlements short-change class members,"
    CALIFORNIA LAWYER (Jun. 2011) ............................................................11

Nagareda, Richard A.,
    *Class Actions in the Administrative State: Kalven and Rosenfield Revisited*,
    75 U. CHI. L. REV. 603 (2008)...............................................................24

Parloff, Roger,
    *Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?*,
    FORTUNE, Dec. 15, 2015..........................................................................3

Rothstein, Barbara J. & Willging, Thomas E.,
    *Managing Class Action Litigation: A Pocket Guide for Judges* (2010) .................10

S. REP. 109-14, at 31 (2005),
    *as reprinted in* 2005 U.S.C.C.A.N. 3, 32 ....................................................6

Silver, Charles,
    *Due Process and the Lodestar Method: You Can't Get There From Here*,
    74 TUL. L. REV. 1809 (2000) .................................................................20

Tharin, James & Blockovich, Brian,
   *Coupons and the Class Action Fairness Act*,
   18 GEO. J. LEGAL ETHICS 1443 (2005) ........................................................................ 7

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988) ................................................. 8

## SUMMARY OF ARGUMENT

Class members' interests are severely compromised by this settlement, which has all of the red flags of an unfair, lawyer-driven settlement identified by the Ninth Circuit and more. Rather than send $11.50 in cash directly to the Auto-Renewal ("AR") class members, whose contact information defendant holds, the parties structured the settlement to benefit their own interests over those of the class. Specifically, they set up a cash-election process—which precedent shows almost certainly will result in a single-digit-percentage claims rate—and will send to those AR class members who do not file a cash-election claim "value certificates" worth $11.50 of McAfee and Intel Security consumer products—which are also almost certain to have single-digit redemption rates. Meanwhile, Reference Price ("RP") class members solely recover near-valueless injunctive relief that would provide the same benefit to them and other consumers regardless of whether they are class members or choose to opt-out of the settlement. As a result, the benefit to the attorneys in this case—$2.4 million in cash—is likely to impermissibly outstrip the *actual* benefit to the class. The Ninth Circuit and Rule 23(e) do not permit approval of such a settlement. *Allen v. Bedolia*, 787 F.3d 1218, 1224 & n.4 (9th Cir. 2015).

Structuring the settlement to provide such illusory relief benefits both defendant and class counsel: Defendant limits its payout, while class counsel claim an excessive fee award based on the inflated "settlement benefit" of $86 million derived from a fictional 100% claims rate. Here, the fantastical $86 million valuation is not only anathema to common sense and basic fairness; counting the face value of coupons that will be disseminated as a default to class members who submit no claim contravenes the Class Action Fairness Act. *In re HP Inkjet Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013) ("*Inkjet*"). Compounding the unfairness, the settlement includes "clear sailing," meaning that defendant agreed not to oppose class counsel's fee request, and any reduction in attorneys' fees made independently by the Court will revert to defendant rather than benefit the class. These tell-tale signs of a lawyer-driven settlement, in which the class' interests were subordinated, remove any doubt that the parties were acting in the best interests of the class by magnanimously sending out coupons to the millions of AR class members who predictably do not file a cash-election form. Such a settlement

does not satisfy Rule 23(e). *See, e.g., In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("*Bluetooth*"); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ("*Pampers*"); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014).

For these reasons, Objector Joshua D. Holyoak requests that the settlement be rejected. In the alternative, if the Court approves the settlement, the Court should delay any award of attorneys' fees until after the redemption rate of the value certificates is known.

## ARGUMENT

**I.    Objector Holyoak is a member of the Auto-Renewal and Reference Price Classes, and intends to appear through counsel at the fairness hearing.**

Objector Joshua D. Holyoak received notice informing him that he is a member of both the Auto-Renewal and Reference Price Classes. *See* Declaration of Dr. Joshua D. Holyoak ("Holyoak Decl.") ¶¶ 3. Holyoak is a U.S. resident who purchased a subscription license for McAfee software during the period from January 10, 2010 to February 10, 2015 and during the same time period, paid McAfee for the automatic renewal of that subscription license at a price greater than the price he paid for the initial subscription license. *See id.* ¶¶ 2, 4. Holyoak did not receive a full refund or credit for the automatic renewal of the McAfee subscription license. *See id.* ¶ 4. Holyoak also initially purchased from McAfee or manually renewed through McAfee a subscription license for any McAfee software during the period from January 10, 2010 to February 10, 2015, and his subscription license was initially purchased or manually renewed at a discounted price. *See id.* ¶ 5. Holyoak is not an employee of McAfee or its parents or affiliates, counsel for any party to the litigation, or the judge or court staff involved in the litigation. *See id.* ¶ 6. Holyoak therefore is a member of the AR and RP settlement classes with standing to object to the settlement. Fed. R. Civ. P. 23(e)(5). Holyoak's address is 2709 Chapel Wood View, Columbia, Missouri 65203, and his telephone number is (573) 823-5378.

The Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF"), through attorney Anna St. John, represents Holyoak. Holyoak gives notice of his intent to appear at the fairness hearing through his counsel Anna St. John, where he wishes to discuss matters raised in this Objection. Holyoak does not intend to call any witnesses or introduce any exhibits at the fairness hearing, but

reserves the right to make use of all documents entered on to the docket by any settling party or objector. Holyoak also reserves the right to cross-examine any witnesses who testify at the hearing in support of final approval. Holyoak objects to any requirement of having to pay two separate fees for his counsel's *pro hac vice* admission as unduly burdensome to his right of objection to this settlement. Holyoak joins the objections of any other objectors to the extent those objections are not inconsistent with this one.

CCAF, which was founded in 2009, litigates on behalf of class members, whom it represents *pro bono*, against unfair class-action procedures and settlements. *See, e.g., Pampers*, 724 F.3d at 716-17 (describing CCAF's client's objections as "numerous, detailed, and substantive") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement") (rejecting settlement approval and certification); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013, at A12 (calling CCAF's founder "[t]he leading critic of abusive class-action settlements"); *see also* Roger Parloff, *Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?*, FORTUNE, Dec. 15, 2015 (calling CCAF's founder "the nation's most relentless warrior against class-action fee abuse").

To preempt any possibility of a false and unjustifiable accusation of objecting in bad faith and seeking to extort class counsel, Holyoak is willing to stipulate to an injunction prohibiting him from accepting compensation in exchange for the settlement of this objection. *See* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem). Holyoak brings this objection through CCAF in good faith to protect the interests of the class. Holyoak Decl. ¶¶ 9-10.

## II.   The Court has a fiduciary duty to the absent class members.

A district court must act as a "fiduciary for the class," "with a jealous regard" for the rights and interests of absent class members. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (internal quotation and citation omitted). The fiduciary role is necessary because "settlement

class actions present unique due process concerns for absent class members," with the "inherent risk … that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee." *Bluetooth*, 654 F.3d at 946  (internal citations and quotation marks omitted). The Sixth Circuit has made similar observations:

> The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval. In contrast, class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition are not present during the negotiations. And thus there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own.

*Pampers*, 724 F.3d at 715.

"Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Bluetooth*, 654 F.3d at 947. It is thus insufficient that the settlement was at "arm's length" and without express collusion between the parties. "While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of actual fraud, overreaching or collusion, the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." *Id.* at 948 (internal quotation omitted). Due to the defendant's indifference as to the allocation of funds between the class, the named representatives, and class counsel, it is enough that the settlement evinces "subtle signs" that class counsel have pursued their own self-interest over the interests of the class. *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (quoting *Bluetooth*, 654 F.3d at 947); *Pampers*, 724 F.3d at 717 ("a settlement's allocation between the class payment and the attorneys' fees is of little or no interest to the defense" (quoting *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.* ("*GMC Pick-Up Truck*"), 55 F.3d 768, 820 (3d Cir. 1995)) (internal quotation marks omitted)).

In accord with its fiduciary role, a court should not apply any presumption in favor of settlement approval; rather, "[t]he proponents of a settlement bear the burden of proving its fairness."

*True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010); *see also* Am. Law Institute, *Principles of the Law of Aggregate Litig.* ("*ALI Principles*") § 3.05(c) (2010) ("In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable."); *GMC Pick-Up Truck*, 55 F.3d at 785 ("the court cannot accept a settlement that the *proponents* have not shown to be fair, reasonable and adequate" (emphasis added) (internal quotation marks omitted)).

In this case, that burden is yet heightened because this settlement has been proposed before class certification. *Dennis*, 697 F.3d at 864; *Bluetooth*, 654 F.3d at 946-47; Federal Judicial Center, *Manual for Complex Litigation* § 21.612 (4th ed. 2004).

## III.  Coupon settlements are disfavored and subject to heightened scrutiny.

The settlement permits AR class members to receive $11.50 in cash "but only if [they] file a Cash Election Form." Long Form Notice (Dkt. 91-1, Heller Decl. Ex. 6) at 2; Corrected Class Action Settlement Agmt. and Release ("Settlement Agmt.") (Dkt. 95) ¶ 28. Otherwise, AR class members will receive a "value certificate" worth $11.50 toward the purchase of McAfee or Intel Security consumer products. Settlement Agmt. (Dkt. 95) ¶ 32. As of October 28, 2016, with less than two months remaining in the claims period, less than 2% of the AR class members had filed a cash election form. Fee Mem. at 7 (noting that 143,384 of the 7.53 million AR members had filed a cash election form).

The inevitable conclusion one must draw from this claims data is that the overwhelming majority of the AR class will receive only a coupon—or "value certificate"—rather than cash. The coupon, in turn, has several limitations that make it unlikely that more than a single-digit percentage of class members will redeem it. In particular, the value certificates may be used only toward McAfee or Intel Security consumer products, which typically cost well above $11.50, and they are only "valid for 150 days after issuance, must be used in a single purchase, are not redeemable for cash and cannot be transferred." Settlement Agmt. ¶ 33. They can be applied to discounted and promotional pricing offered by McAfee, but it is unclear whether they can be combined with other coupons or discounts.

In 2005, Congress passed the Class Action Fairness Act ("CAFA") to combat its findings that "[c]lass members often receive little or no benefit from class actions, and are sometimes harmed, such as where … counsel are awarded large fees, while leaving class members with coupons or other awards

of little or no value." 28 U.S.C. § 1711 note §§ 2(a)(3), (a)(3)(A). Coupon settlements suffer from several flaws, including that "'they often do not provide meaningful compensation to class members; they often fail to disgorge ill-gotten gains from the defendant; and they often require class members to do future business with the defendant in order to receive compensation.'" *True*, 749 F. Supp. 2d at 1069 (quoting *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1302 (S.D. Fla. 2007) and citing other cases); *see also Synfuel Techs. v. DHL Express (USA)*, 463 F.3d 646, 654 (7th Cir. 2006). Coupons also can "serve as a form of advertising for the defendants, and their effect can be offset (in whole or in part) by raising prices during the period before the coupons expire." *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001).

Among the varied remedial measures of CAFA, 28 U.S.C. § 1712 sets forth special rules for fee calculation and settlement valuation where "a proposed settlement in a class action provides for a recovery of coupons to a class member." 28 U.S.C. § 1712(a). Because of the inherent dangers of coupon settlements, CAFA requires a district court to apply "heightened judicial scrutiny"[1] and to value the settlement, at least for fee purposes, based "on the value to class members of the coupons that are redeemed," 28 U.S.C. § 1712(a). *See also Inkjet*, 716 F.3d at 1181-86. The Senate Committee's Report on CAFA confirms these legislative aims:

> [W]here [coupon] settlements are used, the fairness of the settlement should be seriously questioned by the reviewing court where the attorneys' fees demand is disproportionate to the level of tangible, non-speculative benefit to the class members. In adopting [Section 1712(e)'s requirement of a written determination that the settlement is fair, reasonable and adequate], it is the intent of the Committee to incorporate that line of recent federal court precedents in which proposed settlements have been wholly or partially rejected because the compensation proposed to be paid to the class counsel was disproportionate to the real benefits to be provided to class members.

S. REP. 109-14, at 31 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 32.

It is thus surprising for class counsel to make the legally unfounded claim that the total value of the settlement is $86 million, based on a 100% coupon redemption rate. Fee Mem. at 1. This

---

[1] *See Synfuel*, 463 F.3d at 654; *True*, 749 F. Supp. 2d at 1069; *Figueroa*, 517 F. Supp. 2d at 1308.

approach would even transgress Judge Berzon's more lenient dissenting view in *Inkjet*, 716 F.3d at 1197 ("[I]f attorneys are, in whole or in part, awarded contingent fees—that is, fees equal to a percentage of the purported monetary value of the class relief—CAFA requires federal courts to assess those fees based on the value of the coupons actually redeemed."). It is clear from the sub-2% cash election last reported that the overwhelming bulk of AR class members will recover a coupon rather than any cash. Past precedent shows that a single-digit redemption rate is far more probable than class counsel's Pollyanna outlook. *See True*, 749 F. Supp. 2d at 1074-75 (rebuffing witness's suggested redemption rate and citing two cases with redemption rates under 2%); *Monteferrante v. Container Store*, Civ. No. 13-11362, 2015 U.S. Dist. LEXIS 13212 (D. Mass. Feb. 4, 2015) (claims rate of 1.8% for a $10 coupon); *Davis v. Cole Haan, Inc.*, No. C 11-01826, 2013 U.S. Dist. LEXIS 151813, at *5-*6 (N.D. Cal. Oct. 21, 2013) (claims rate below 1% for a $20 voucher); *Dardarian v. OfficeMax N. Am., Inc.*, No. 11-cv-00947, 2014 U.S. Dist. LEXIS 178463, at *5 (N.D. Cal. Dec. 30, 2014) (reflecting upon a redemption rate of sub-7% of the face value of $10 and $5 distributed to class members); James Tharin & Brian Blockovich, *Coupons and the Class Action Fairness Act*, 18 Geo. J. Legal Ethics 1443, 1445, 1448 (2005) (typically "redemption rates are tiny," "mirror[ing] the annual corporate issued promotional coupon redemption rates of 1-3%"); Steven B. Hantler & Robert E. Norton, *Coupon Settlements: The Emperor's Clothes of Class Actions*, 18 Geo. J. Legal Ethics 1343, 1347 (2005) (noting one settlement where only 2 of more than 96,000 coupons were redeemed). Coupon redemption rates "may be particularly low in cases involving low value coupons." *Sobel v. Hertz Corp.*, No. 3:06-cv-00545, 2011 U.S. Dist. LEXIS 68984, at *35-*38 (D. Nev. June 27, 2011) ($100 discount "certificate" for car rental).

The parties cannot rely on their denomination of the relief as "value certificates" to evade the effect of CAFA. *See Inkjet*, 716 F.3d at 1176 ("e-credits" are a "euphemism" for coupons); *cf. also Khatib v. County of Orange*, 639 F.3d 898, 905 (9th Cir. 2011) (the legal effect of a term "is a question of function, not just labeling"). Numerous courts have rejected similar semantic efforts to avoid the legal conclusion that certain relief constitutes a coupon. *See, e.g., Fleury v. Richemont N. Am.*, No. C-05-4525, 2008 U.S. Dist. LEXIS 112459 (N.D. Cal. Aug. 6, 2008) ("credits"); *In re HP Inkjet Litig.*, 5:05-cv-3580,

2011 U.S. Dist. LEXIS 37446 (N.D. Cal. Mar. 29, 2011) ("e-credits"); *True*, 749 F. Supp. 2d at 1069 ("rebates"); *Sobel*, 2011 U.S. Dist. LEXIS 68984, *13-*14 (D. Nev. June 27, 2011) ("certificates"); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 952 (9th Cir. 2015) ("*Online DVD*") (courts should "ferret[] out the deceitful coupon settlement that merely co-opts the term 'gift card' to avoid CAFA's requirements").

Because Congress did not define "coupon" in CAFA, a court must "look to the word's ordinary meaning." *Inkjet*, 716 F.3d at 1181. "A coupon may be defined as a certificate or form 'to obtain a discount on merchandise or services,'" and "Webster's also defines coupons as 'a form surrendered in order to obtain an article, service or accommodation.' Coupons are commonly given for merchandise for which no cash payment is expected in exchange." *Dardarian v. Officemax N. Am., Inc.*, No. 11-cv-00947, 2013 U.S. Dist. LEXIS 98653, at *6-*7 (N.D. Cal. July 12, 2013) (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988)).

In that vein, the Ninth Circuit's recent elucidation of what constitutes a "coupon" further supports the finding that the "value certificates" are in fact coupons. In *Online DVD*, the court identified several features that distinguished the gift cards provided under the settlement from coupons subject to CAFA: they "can be used for any products on walmart.com, are freely transferrable … and do not expire, and do not require consumers to spend their own money." 779 F.3d at 951. The court emphasized that the gift cards allowed class members to purchase, without any spending any of their own cash, their "choice of a large number of products from a large retailer" (walmart.com). *Id.* at 952 (expressly confining its holding to walmart.com gift cards "without making a broader pronouncement about every type of gift card that might appear"). Here, in contrast, the "value certificates" cannot be transferred, expire in approximately 5 months, can be used for only a limited number of consumer security products, and typically will require consumers to spend significantly more of their own money on defendant's products. *See* https://www.mcafee.com/consumer/en-us/store/m0/catalog.html (McAfee's "top products" for consumers appear to range from 49.99 (currently discounted from $89.99) to $79.99 per year); Settlement Agmt. (Dkt. 95) ¶ 33.

The value certificates are readily analogized to the "e-credits" that the Ninth Circuit held to be "coupons" for purposes of § 1712 in *Inkjet*. There, "[t]he 'e-credits'—a euphemism for coupons— expire[d] six months after issuance, [we]re non-transferable, and [could not] be used with other discounts or coupons." *Inkjet*, 716 F.3d at 1176.

That a small percentage of the AR class will receive cash does not change the valuation method. Whether or not the settlement includes a cash fund, using coupons relief "provides class counsel with the opportunity to puff the perceived value of the settlement so as to enhance their own compensation." *Inkjet*, 716 F.3d at 1179; *see also* Christopher R. Leslie, *A Market-Based Approach to Coupon Settlements in Antitrust and Consumer Class Action Litigation*, 49 UCLA L. REV. 991, 1049 (2002). CAFA makes clear that settlements that create non-coupon value in addition to coupon value (*i.e.*, those where a separate *portion* of the attorney's fee award is attributable to non-coupon relief) still fall within its ambit. *See* 28 U.S.C. § 1712(a); *see also* 28 U.S.C. § 1712(c) (discussing fees in settlements involving both coupon and non-coupon relief); *True*, 749 F. Supp. 2d at 1069 n.20 (rejecting argument that settlement was not a "coupon settlement" since "other relief" was involved). Otherwise, the aims of CAFA could be circumvented by settlements that offered class members only a coupon plus $1.

## IV.    There is no legitimate reason why this settlement does not issue direct payments to known, eligible class members.

Lest class counsel seek praise for sending non-cash electing AR class members coupons rather than leaving them with nothing (as some claims-made settlements have), the Court need look only to the facts and settlement structure to see through that argument. The default use of coupon relief is particularly pernicious here because McAfee's records contain identifying information for the class members. The Settlement Agreement even provides that "[c]omposition of the Auto-Renewal Class and Reference Price Class shall be based exclusively upon McAfee's records. McAfee's records include the email and physical addresses provided to McAfee by the account holders." Settlement Agmt. (Dkt. 95) ¶ 4. That contact information served as the foundation of the direct email and mail notification scheme: "Pursuant to the Court-approved notice program, McAfee's customer records were utilized to provide direct email and mailed notice to class members." Mot. for Final Approval (Dkt. 98) at 10.

In fact, "McAfee provided the Settlement Administrator with a Class List that included the last known email address and mailing address for *each* class member." *Id.* (emphasis added). Notice was sent directly to class members by email or U.S. Mail. *Id.* Settlement Agmt. ¶¶ 10-11. Significantly, for over 3.7 million class members to whom email notice was undeliverable, the settlement administrator "caused the address information to be updated using the [National Change of Address] database" and mailed postcard notice to those class members. Decl. of Brian Devery ISO Pls.' Mot. for Final Approval and Mot. for Award of Attys. Fees (Dkt. 98-1) ¶¶ 12-14.

But rather than establishing a system of direct cash payment to the known AR class members, the parties erected an artificial and perfunctory hurdle: the filing of a cash election form. A claims-made (here, called "cash-election") process doesn't merely benefit the defendant (by diminishing the amount that it must pay to obtain a release from the class). It also benefits class counsel by enabling them to seek a disproportionate percentage of the settlement fund by inflating the appearance—but not the reality—of class relief. The settlement structure thus raises concern that class members are being sent the value certificates primarily to inflate the settlement value so as to justify excessive attorneys' fees.

The parties will likely respond that a claims process is common in class action settlement administration. Even if that is true as a general matter, in this particular settlement the process is suspect. When a claims-made process is employed in lieu of direct payment mechanisms, the court should assure itself that there is a valuable reason for its use. Often, a claims-made structure can be justified by the fact that a defendant is unable to identify specific class members or unable to identify the value of those class members' claims, leading to a *pro rata* distribution of a set settlement amount. Neither situation exists here, where (i) the defendant's records house the class members' identifying information (and the settlement administrator is updating any records that may be out of date through the National Change of Address database), and (ii) the settlement specifies the dollar amount of recovery. "In too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members. When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without

OBJECTION OF JOSHUA D. HOLYOAK

requiring claim forms." Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* at 6 (2010), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf.

The abuse of claims-made settlements to inflate attorneys' fees and deflate defendants' payment obligations to class members has been the subject of substantial criticism. *E.g.*, Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* 19-20, 30 (2010)[2]; Pamela A. MacLean, "Dealing for Dollars: Objectors allege that claims-made settlements short-change class members," CALIFORNIA LAWYER (Jun. 2011). Thus, it is increasingly common for courts, particularly in this district, to refuse to accept superfluous claims processes. *Deatrick v. Securitas Sec. Servs. USA*, No. 13-cv-05016-JST, 2016 U.S. Dist. LEXIS 22597, at *22-*23 (N.D. Cal. Feb. 24, 2016) (Tigar, J.) (concluding that the "claim form requirement puts unnecessary impediments in the path of plaintiffs receiving their due compensation for their injuries under the proposed settlement."); *Rubio-Delgado v. Aerotek, Inc.*, No. 13-cv-03105-SC, 2015 U.S. Dist. LEXIS 75300, at *15-*23 (N.D. Cal. June 10, 2015) (Conti, J.) (denying approval where defendants' records rendered claims process unnecessary); *Burden v. Selectquote Ins. Servs.*, No. C 10-05966 SBA, 2013 U.S. Dist. LEXIS 16977, at *3-*4 (N.D. Cal. Feb. 5, 2013) (Armstrong, J.) (delaying approval pending explanation of why "direct payments are not being made to Class Members"); *Smith v. Levine Leichtman Capital*, No. C 10-00010 JSW, 2012 U.S. Dist. LEXIS 163672, at *8 (N.D. Cal. Nov. 15, 2012) (Smith, J.) (expressing mystification at use of claims submission process when 75-80% of class members could already be identified); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 391 (C.D. Cal. 2007) (questioning necessity of claims process and denying settlement approval). As Judge Alsup explains:

> A settlement that imposes a claim procedure rather than cutting checks to class members for the appropriate amount may impose too much of a burden on class members… The best approach is to calculate settlement checks from defendant's records … and to send the checks to the class members along with a notice that cashing the checks will

---

[2] This Federal Judicial Center publication is available online at http://www.fjc.gov/public/pdf.nsf/lookup/ClassGd3.pdf/$file/ClassGd3.pdf.

OBJECTION OF JOSHUA D. HOLYOAK

be deemed acceptance of the release and all other terms of the settlement.

*E.g., Manchouck v. Mondelez Int'l Inc.*, No. C 13-02148 WHA, 2013 U.S. Dist. LEXIS 80132, at \*5 (N.D. Cal. June 3, 2013).

The Court should hold that depressing class relief is not a legitimate reason to use the superfluous cash-election mechanism and, like other courts that have confronted such needless processes, reject the settlement. *See supra* 11 (listing cases); *De Leon v. Bank of Am.*, No. 6:09-cv-1251, 2012 U.S. Dist. LEXIS 91124, at \*62 (M.D. Fla. Apr. 20, 2012) (finding that a low-value claims-made settlement would "surely result in a low claims rate" and rejecting the claims procedure as "not reasonable"); When compelled to do so by objectors and courts, settling parties will eliminate gratuitous claims procedures. *E.g., Deatrick v. Securitas Sec. Servs. USA*, No. 13-cv-05016, 2016 U.S. Dist. LEXIS 47916, at \*18 (N.D. Cal. Apr. 7, 2016) (observing that the parties amended their initial settlement to remove the unjustified claims procedure); *McDonough v. Toys "R" Us*, 80 F. Supp. 3d 626 (E.D. Pa. 2015) (approving, after CCAF prosecuted successful challenge to initial settlement at the Third Circuit, an amended agreement that provided for direct payments to class members whose contact information was available in the defendants' records).[3]

## V.   The proposed settlement does not pass the Rule 23(e) fairness inquiry because it allows class counsel to obtain a disproportionate amount of the settlement proceeds.

A class action settlement may not confer preferential treatment upon class counsel to the detriment of class members. When, as here, "counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded," a settlement is unfairly tilted toward class counsel. *Bluetooth*, 654 F.3d at 947 (internal quotation marks omitted); *GMC Pick-Up Truck*, 55 F.3d at 803 ("non-cash relief … is recognized as a prime indicator of suspect settlements"). The signs of an inequitable settlement here are not subtle: an unnecessary

---

[3] Another viable option for the parties is limiting the release to those class members who file cash election forms. *See Fraser v. Asus Computer Int'l*, No. C 12-00652 WHA, 2012 U.S. Dist. LEXIS 181315, at \*7-\*10 (N.D. Cal. Dec. 21, 2012) (release should be limited to those who submit claim forms), *revised settlement granted preliminary approval* at 2013 U.S. Dist. LEXIS 22338 (N.D. Cal. Feb. 19, 2013).

claims process, the excessive attorneys' fee provision reinforced by a clear-sailing clause, along with the illusory coupon and injunctive relief and a valuation that violates the Class Action Fairness Act, 28 U.S.C. § 1712. The parties designed the settlement's structure to simultaneously insulate class counsel's fee award with the illusion of class recovery, while providing the defendant with the inexpensive release of claims and an end to the litigation. *See Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003) (if "fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained").

In *Bluetooth*, the Ninth Circuit identified three red flags that indicate an unfair lawyer-driven settlement: (1) unreasonable disparity between the class award and the attorneys' negotiated fee award; (2) "clear sailing," in which a defendant agrees not to oppose class counsel's fee request; and (3) a "kicker," such that any unclaimed settlement proceeds revert to the defendant rather than benefiting the class. 654 F.3d at 947. All three warning signs are present here and strongly indicate that the settlement cannot pass the Rule 23(e) fairness analysis.

**A.    Disproportionate attorneys' fees**

A fair settlement requires a fair allocation of the proceeds. *See, e.g.*, *Bluetooth*, 654 F.3d at 942. For the court's fairness analysis, the "'ratio that is relevant is the ratio of (1) the fee to (2) the fee plus what the class members received." *Pearson*, 772 F.3d at 781 (quoting *Redman*, 768 F.3d at 630); *see also Allen*, 787 F.3d at 1224 (examining class benefit in terms of "economic reality"). A settlement that allocates to class counsel well in excess of the Ninth Circuit's 25% benchmark cannot be approved. *See, e.g.*, *Dennis*, 697 F.3d at 868 (38.9% fee would be "clearly excessive"); *Allen*, 787 F.3d at 1224 n.4 (fee award that exceeds class recovery by a factor of three is disproportionate); *Pearson*, 772 F.3d at 781 (69% fee is "outlandish"); *see also Bluetooth*, 654 F.3d 935.

Class counsel brazenly claim that the $2.4 million in fees and expenses that they now seek "represents less than 3% of the approximately $86 million in Settlement Benefits that will be provided to Auto-Renewal Class members under the Settlement." Mem. of Points and Authorities ("Fee

Mem.") (Dkt. 99) at 1. This assertion alone demonstrates class counsel's attempt to create the illusion of valuable relief to class members while capturing an excessive attorneys' fee award. The reality, of course, is that AR class members will obtain a small fraction of the purported $86 million "benefit." Indeed, as of October 28, 2016, only 143,384 cash elections had been filed by the 7.53 million AR class members, amounting to $1,648,916 of settlement value. *Id.* at 3.

While the number of cash-election claims is likely to increase by the deadline of December 23, 2016, the settlement value is still likely to fall far short of the $9.6 million constructive common fund needed to justify class counsel's $2.4 million request on a 25% benchmark basis.[4] Consistent with the initial cash-election rate, claims rates are notoriously low in consumer class settlements such as this. *See, e.g., Sullivan v. DB Investments*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) ("consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns" (internal quotation marks omitted)); *In re Livingsocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 18-19 (D.D.C. 2013) (noting 0.25% claims rate); Tiffany Janowicz, *et al.*, Webinar, *Settlement Administration: Impacting Claims Filing Rates*, 24, *available at* http://media.straffordpub.com/products/crafting-class-settlement-notice-programs-due-process-reach-claims-rates-and-more-2014-02-18/presentation.pdf (prominent settlement administrator found that direct mail notice consumer class action settlements result in claims rates of 0-3% when $5 is available and 1-5% when $15 is available); Declaration of Dan

---

[4] Litigation expenses should be included in the numerator of the percentage-of-recovery calculation because, otherwise, class counsel are incentivized to treat resources as a litigation expense (because they will be reimbursed) and to increase those expenses (inflating the common fund value), knowing that such reimbursable expenses will not be counted against the 25% benchmark. Every dollar class counsel spends is not just a dollar taken from the class, but effectively would allow class counsel to earn a *commission* on those expenses. At a minimum, if the Court is to exclude litigation expenses from the numerator, it also should exclude those same expenses from the denominator. *See, e.g., In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634, 2015 U.S. Dist. LEXIS 67904, at *14-*16 (N.D. Cal. May 26, 2015) (excluding both administrative and litigation expenses before calculating attorneys' fees); *In re Wells Fargo Sec. Litig.*, 157 F.R.D. 467, 471 (N.D. Cal. 1994) ("If an attorney risks losing some portion of his fee award for each additional dollar in expenses he incurs, the attorney is sure to minimize expenses.").

OBJECTION OF JOSHUA D. HOLYOAK

Rosenthal ¶ 12, *NVIDIA GPU Litig.*, No. 5:08-cv-4312, Dkt. 357 (founder of class action settlement claims administrator testified that claims rates are typically 0.5% to 1.5%).

Thus, while class counsel claim that their fee request equals less than 3% of the settlement benefit, their calculation is based on a faulty denominator. The only demonstrable benefit to class members is the cash (currently $1,648,916) claimed by class members. It is unknown how many of the coupons sent to the AR class members who do not file a claim for cash and who have expressed no discernible interest in receiving the coupons will be redeemed (though the likelihood is very few). Accordingly, the total common fund currently demonstrated in this case is $4,048,916 (cash elections plus $2.4 million in attorneys' fees and litigation expenses). Even if the number of cash elections doubles by the claims deadline, class counsel's request still represents more than 40% of the demonstrable settlement. This surpasses the 38.9% figure that the Ninth Circuit has referred to as "clearly excessive." *Dennis*, 697 F.3d at 868; *see also Dugan v. Lloyds TSB Bank*, No. C 12-02549 WHA, 2014 U.S. Dist. LEXIS 60852 (N.D. Cal. Apr. 24, 2014) (refusing to grant fees of $1.75 million when class monetary recovery was only $1.6 million).

As class counsel alluded to in their motion requesting attorneys' fees, they will likely respond that the $86 million "made available" to class members but never claimed (and which will revert to the defendant) should be considered value generated by the settlement. There are strong legal and policy reasons to reject this argument. Most significantly, the parties—despite having class members' contact information—imposed an unnecessary claims process to reduce the number of cash elections, while creating illusory forms of relief to make the value of the settlement appear larger than it is. The use of such anti-class mechanisms should not be condoned through settlement approval.

The authority cited by class counsel to support their fictional valuation for the purpose of securing their excessive fees is readily distinguishable. Fee Mem. at 7 n.5. Class counsel claim that the Court should consider the full amount "made available" to the AR class members. Notably, all of the cases they cite for this proposition predate *Bluetooth*, *Dennis*, and *Allen*, all of which demonstrate that simply considering the gross funds hypothetically available is insufficient. Doctrinally, *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), is inapplicable because it involved a fee dispute between class counsel

and the defendant. It has no bearing on the Rule 23(e) fairness inquiry; the case was a class action litigated to judgment, not a settlement where class counsel sacrificed the class to a feeble claims-made structure. *Boeing* is not applicable where "[t]here is no fund … and no litigated judgment, and there was no reasonable expectation in advance of the deadline for filing claims that more members of the class would submit claims than did." *Pearson*, 772 F.3d at 782; *but see Gascho v. Global Fitness Holdings*, 822 F.3d 269, 285-86 (6th Cir. 2016) (departing from *Pearson* without considering the distinction between settlement and litigation posture). Because it did not involve a settlement, *Boeing* also did not involve a self-serving clear-sailing agreement and kicker where class counsel negotiated a settlement with a superfluous claims-made procedure. *Boeing* class counsel took extraordinary steps to get money to their clients and succeeded to a large degree. *See* 472 U.S. at 476 n.4. The same cannot be said for class counsel here.

Thus, even if *Boeing* permitted such a disproportionate fee when a defendant litigates over what it will pay class counsel, it does not consider or speak about the Rule 23(e) fairness of the settlement where class members have complained about *Bluetooth*-esque allocational fairness, clear-sailing, and a kicker. Similarly, *Williams v. MGM-Pathe Comms. Co.*, 129 F.3d 1026 (9th Cir. 1997), exclusively addressed attorneys' fees rather than Rule 23(e) fairness concerns. Moreover, *Boeing*, if it remains good law after the 2003 amendments to Rule 23,[5] is more appropriately viewed as applying to cases with an actual common fund placed in escrow, not to a constructive common fund settlement like the one at issue here. *See, e.g., Strong v. Bellsouth Telecomms. Inc.*, 137 F.3d 844, 848 (5th Cir. 1998) (affirming denial of class counsel's fee request based on "illusory" valuation and delay of fee award until actual amount of distribution to class was known).[6]

---

[5] *See Gascho*, 822 F.3d at 299-300 (Clay, J., dissenting). *Gascho* is the subject of a pending *certiorari* petition supported by seventeen state Attorneys General as *amici*. *See* http://www.scotusblog.com/case-files/cases/blackman-v-gascho/ (last accessed November 16, 2016).

[6] It is unclear what analogy class counsel sought to draw by citing *Hopson v. Hanesbrands*, No. CV-08-0488, 2009 U.S. Dist. LEXIS 33900 (N.D. Cal. Apr. 3, 2009). Fee Mem. at 7 n.5. There, the settlement provided for a second round of distributions to class members *pro rata* if the settlement fund that remained after an initial distribution exceeded a $15,000 threshold; if that threshold was not

OBJECTION OF JOSHUA D. HOLYOAK

That McAfee also has agreed to implement certain changes in its business practices going forward does not add to the settlement benefit realized by class members. First, McAfee will include at the point of sale in any sales process involving sales at a discount off a reference price and subject to automatic renewal language informing customers that their subscription will be automatically renewed at an undiscounted subscription price in effect at the time of renewal and that the subscription price is subject to change. Settlement Agmt. ¶ 37(a). McAfee will place similar disclosures on its website, in its end user license agreement, and in notices sent to its subscribers regarding automatic renewal. *Id.* Second, McAfee will use as a reference price in its advertisements only a price at which McAfee actually has offered and will offer that product on its homepage for a specified amount of time. *Id.* ¶ 37(b).

Neither change in business practices can be considered class relief. Both are prospective changes that will benefit only those consumers who do business with McAfee in the future. "'The fairness of the settlement must be evaluated primarily based on how it *compensates class members*'—not on whether it provides relief to other people…." *Pampers*, 724 F.3d at 720 (quoting *Synfuel Techs.*, 463 F.3d at 654) (emphasis in original). "[F]uture purchasers are not members of the class, defined as it is as consumers who have purchased [the service]." *Pearson*, 772 F.3d at 786. These cases recognize that a class composed of people who have done business with a defendant *in the past* is not served by prospective injunctive relief that can at most only benefit those who do business with a defendant *in the future*. Even in the unlikely event that the injunctive relief imposes significant costs on the defendant, this is not the measure of compensable value. *Bluetooth*, 654 F.3d at 944 ("[T]he standard [under Rule 23(e)] is not how much money a company spends on purported benefits, but the value of those benefits to the class." (internal quotation marks omitted)).

exceeded, the small amount remaining in the settlement fund would be sent to a *cy pres* recipient. In no case did the fund revert to the defendant. *Id.* at *24-*25. While the court may have noted in passing that attorneys' fees are to be based on the funds made available to the class, *id.* at *11, the facts and reasoned analysis of the case are not applicable here.

While injunctive relief may be appropriate in some class actions, the focus of the Rule 23(e) inquiry is the benefit *to the class*.[7] The class members here receive nothing as a result of McAfee's changes—unless they happen also to be future customers of McAfee. *See Boyd v. Avanquest N. Am., Inc.*, No. 12-cv-04391, 2015 U.S. Dist. LEXIS 93458, at *10 (N.D. Cal. July 17, 2015) ("The prospective relief, while of some value to future consumers, does not provide relief to class members, who have already suffered injury."). And even then, class members will already be aware of the information disclosed by McAfee, *i.e.*, that their subscription will be renewed automatically at the undiscounted subscription price then in effect, because of their involvement in this litigation. Notably, the settlement does not prohibit McAfee from using the undiscounted subscription price for auto-renewals or limit its ability to increase the subscription renewal price. *See* Order Granting Motion for Prelim. Approval of Class Action Settlement (Dkt. 96) at 11. And it is unclear how requiring that McAfee *not* discount a reference price for certain periods of time actually benefits *any* consumer. As a result, the prospective injunctive relief is inherently illusory to future and current customers.

In any event, an AR or RP class member will experience no benefit from McAfee informing *other people* of its practice of renewing a subscription. Just as non-class members will experience a "benefit" from these practice changes only if they purchase products from McAfee, so, too, will class members experience the benefit only if they purchase McAfee products in the future. Class members receive no marginal benefit compared to non-class members and thus have received no consideration for the waiver of their claims from these changes in business practices.

## B.     The clear sailing agreement

The settlement also contains a second of *Bluetooth*'s warning signs: "clear sailing," in which the defendant agrees not to contest an attorneys' fee award. Settlement Agmt. ¶ 38; *Bluetooth*, 654 F.3d at 947; *see also Redman*, 768 F.3d at 637. "Such a clause by its nature deprives the court of the advantages of the adversary process." *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991).

---

[7] For example, a 23(b)(2) civil-rights class may seek to change the future behavior of a governmental body or employer with respect to class members who have ongoing relationships with the defendant.

Indeed, its "'very existence'" "'increases the likelihood that class counsel will have bargained away something of value to the class.'" *Bluetooth*, 654 F.3d at 948 (quoting *Weinberger*, 925 F.2d at 525). The clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees" and "suggests, strongly," that its associated fee request should "be placed under the microscope of judicial scrutiny." *Weinberger*, 925 F.2d at 518, 524-25; *accord Redman*, 768. F.3d at 637.

> Provisions for clear sailing clauses 'decouple class counsel's financial incentives from those of the class, increasing the risk that the actual distribution will be misallocated between attorney's fees and the plaintiffs' recovery. They potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class.'

*Vought v. Bank of Am.*, 901 F. Supp. 2d 1071, 1100 (C.D. Ill. 2012) (quoting *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 1224 (2000) (O'Connor, J., respecting the denial of certiorari)); *accord* William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 TUL. L. REV. 813, 816 (2003) (courts should "adopt a per se rule that rejects all settlements that include clear sailing provisions"). "[W]hile the present case does not utilize a classic reversionary fund in which attorneys' fees are paid from a common pool that directly reduces the class's recovery, it undoubtedly did not escape either party's attention that every dollar not claimed from the fund was one dollar that [defendant] could use to pay class counsel's fees." *Vought*, 901 F. Supp. 2d at 1101. Clear sailing also undermines any conceivable benefit of separate negotiation of fees and terms. *Sobel*, 2011 U.S. Dist. LEXIS 68984, at *45.

Because of this second indication that the deal is unfairly skewed in favor of class counsel, the Court "has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class, being careful to avoid awarding 'unreasonably high' fees simply because they are uncontested." *Bluetooth*, 654 F.3d at 948 (quoting *Staton*, 327 F.3d at 954).

C.     The "kicker" clause / segregated fee fund

The settlement also contains a third *Bluetooth* warning sign: a "kicker" providing that any reduction in the fee reverts to the defendant, rather than the class. The settlement effectuates this by stipulating that fees will be paid separate and apart from class relief and by specifying that any funds remaining in the cash payment account will revert to defendant. Settlement Agmt. ¶¶ 31(f), 38. This "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Bluetooth*, 654 F.3d at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.*

In a typical common fund settlement, the district court may, at its discretion, reduce the fees requested by plaintiffs' counsel—and when it does so, the class will benefit from the surplus. Under the proposed settlement, however, if the court awards less than the $2.4 million in fees and expenses that the defendant has already agreed to pay to class counsel, the defendant will be the only beneficiary. Settlement Agmt. ¶ 38. Because of the "economic reality … that a settling defendant is concerned only with its total liability," this settlement is therefore worse for the class than a traditional common fund. *Pampers*, 724 F.3d at 713 (quoting *Strong*, 137 F.3d at 849). In effect, the parties have prevented the court from returning the fees and class relief to natural equilibrium.

The "kicker" has the additional self-serving effect of protecting class counsel by deterring scrutiny of the fee award. A court has less incentive to scrutinize a fee award, because the kicker combined with the clear-sailing agreement means that any reversion benefits only the defendant that has already agreed to pay that initial amount. Charles Silver, *Due Process and the Lodestar Method: You Can't Get There From Here*, 74 Tul. L. Rev. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack"); Lester Brickman, Lawyer Barons 522-25 (2011) (same; further arguing that reversionary kicker should be considered *per se* unethical). At a minimum, clear-sailing in conjunction with fee segregation is a red flag of a self-serving settlement that merits a "clear explanation" justifying why this settlement was negotiated in such a manner as to make the class worse off. *See Bluetooth*, 654 F.3d at 949.

**D.     Inadequate representation**

The settlement's disproportionate allocation, clear sailing, and kicker evidence the inadequacy of the classes' representation under Rule 23(g)(4). *See Lobatz v. U.S. W. Cellular of Cal., Inc.,* 222 F.3d 1142, 1147 (9th Cir. 2000) (if "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class"); *Gallego v. Northland Group Inc.*, 814 F.3d 123 (2d Cir. 2016) (affirming denial of certification where "the intended result of the settlement was 'mass indifference, a few profiteers, and a quick fee to clever lawyers.'" (quoting district court decision)); *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 118-19 (S.D.N.Y. 1999) (finding representation inadequate where settlement "provid[ed] a nonpecuniary benefit of very little value … and a fairly substantial award of attorney's fees"); *In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 311 (S.D.N.Y. 2001) ("an excessive compensation proposal can cast in doubt the ability of proposed lead counsel to adequately represent the class"); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 319 (3d Cir. 2005) (district court not "able to fulfill its duty to scrutinize rigorously the fairness of the settlement" where it misunderstands appellants' challenge to the adequacy of class counsel's representation of absent class members).

Moreover, because the class representatives are acting as the agents of class counsel in permitting this settlement to go forward, while seeking $1,250 incentive awards for themselves, they do not meet the 23(a)(4) standard. *See Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157 (9th Cir. 2013); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 960 (9th Cir. 2009); *In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011). In short, "[c]onflicted representation provides an independent ground for reversing [a] settlement." *Etter v. Thetford Corp.*, No. 8:13-81, Dkt. 221 at 11 (C.D. Cal. Oct. 14, 2014) (internal quotation marks omitted).

**VI.     In the alternative, if the Court approves the settlement, the Court should not award attorneys' fees until the coupon redemption rate is known.**

As a fiduciary for the class, the Court maintains a duty of keen oversight of all settlement proceedings. *See supra* §II. The fiduciary role remains necessary at the fee-setting stage, where "the relationship between plaintiffs and their attorneys turns adversarial," when counsel's "interest in getting paid the most for its work representing the class [is] at odds with the class' interest in securing

the largest possible recovery for its members." *Mercury Interactive*, 618 F.3d at 994 (internal quotation and citation omitted); *see also Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) … protects unnamed class members 'from unjust or unfair settlements.'"). A fee award needs to be attuned to the result actually achieved for the class, to the money the settlement actually puts in class members' hands. *See, e.g., In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 179 (3d Cir. 2013). "While attorneys' fees and costs may be awarded in a certified class action where so authorized by law or the parties' agreement, Fed. R. Civ. Proc. 23(h), courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. "Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process." Advisory Committee Notes on 2003 Amendments to Rule 23.

Active judicial involvement is particularly appropriate where a settlement involves a coupon component, which necessitates application of CAFA. Although CAFA allows part of the attorneys' fees award to be based on the lodestar method when there is a meaningful non-coupon component of the settlement, a percentage of the coupon redemption rate is still the only permissible manner of awarding any fees "attributable to" the settlement's coupon relief. *Inkjet*, 716 F.3d at 1182. Employing lodestar methodology in a CAFA settlement like this compounds problems. "[T]he class is being asked to 'settle,' yet Class Counsel has applied for fees as if it had won the case outright." *Sobel*, 2011 U.S. Dist. LEXIS 68984, at *44. A lodestar approach necessitates "adjust[ing] the amount of any fees award to account for the degree of success class counsel attained." *Inkjet*, 716 F.3d at 1186 n.18 (internal quotation marks omitted). And, to avoid double-billing, any supplementary lodestar award for non-coupon relief must be decreased to account for the percentage-based coupon award. *Galloway v. Kan. City Landsmen*, 833 F.3d 969 (8th Cir. 2016) (affirming district court decision to reduce lodestar by 90% in a mixed coupon/injunctive relief settlement to account for the coupon-based percentage award).

Regardless of which approach the Court uses to determine an attorneys' fee award, in any settlement, a "fundamental focus" in awarding fees is on the "result *actually* achieved for class

OBJECTION OF JOSHUA D. HOLYOAK

members." Fed. R. Civ. P. 23(h) (emphasis added). "Plaintiffs attorneys don't get paid simply for working; they get paid for obtaining results." *Inkjet*, 716 F.3d at 1182. "Where the parties have reached a coupon settlement, the actual monetary value of the coupons redeemed by the class is a prime consideration in th[e] assessment [of reasonable attorneys' fees]: it is an indispensable factor in evaluating the reasonableness of the lodestar figure, and it is determinative when calculating an award as a percentage of the recovery." *Fouks v. Red Wing Hotel Corp.*, No. 12-CV-2160, 2013 U.S. Dist. LEXIS 165588, at *19 (D. Minn. Nov. 21, 2013). "Because redemption rates have a direct and potentially devastating impact on the actual value received by the class, such lack of evidence prevents any reasoned assessment of the settlement's actual value to the class." *Sobel*, 2011 U.S. Dist. LEXIS 68984, at *36; *see also Redman*, 768 F.3d at 634 ("What was inappropriate was an attempt to determine the ultimate value of the settlement before the redemption period ended without even an estimate by a qualified expert of what that ultimate value was likely to prove to be."). In light of these authorities, class counsel's request for a 1.449 multiplier on their lodestar is particularly excessive at this stage of the proceedings.

The policy reasons for basing an attorneys' fee award on the redemption rate "cannot be overemphasized": "the attorneys' fees provisions of § 1712 are intended to put an end to the 'inequities' that arise when class counsel receive attorneys' fees that are grossly disproportionate to the actual value of the coupon relief obtained for the class." *Inkjet*, 716 F.3d at 1179.

Deferring or staggering the fee award, an accepted judicial practice, will enable the Court to award fees based on redeemed coupons, consistent with CAFA, and will ensure a fee award that is more appropriately proportionate to the actual class benefit. *See, e.g., Rougvie v. Ascena Retail Group, Inc.*, No. 15-cv-00724, 2016 U.S. Dist. LEXIS 99235, at *83 (E.D. Pa. July 29, 2016) ("Congress mandates we award attorneys' fees attributable to the award of coupons based on the value of the class members of the redeemed coupons."); *Davis v. Cole Haan, Inc.*, No. 11-cv-01826, 2015 U.S. Dist. LEXIS 153434 (N.D. Cal. Nov. 12, 2015) (awarding one-third of the value of the coupons actually redeemed) (2.4% of the unsolicited coupons were redeemed); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 292 F. Supp. 2d 184, 189-90 (D. Me. 2003) ("delay[ing] award of attorney fees until experience shows

how many vouchers are exercised and thus how valuable the settlement really is"); Richard A. Nagareda, *Class Actions in the Administrative State: Kalven and Rosenfield Revisited*, 75 U. CHI. L. REV. 603, 644 (2008) ("What rightly matters in this corner of the class action settlement world is not the overall value of the coupons made available to class members but, rather, the value of those actually redeemed.").

## CONCLUSION

The coupon settlement allocates a disproportionate share of the settlement benefit to class counsel at the expense of class members and also contains with other red flags of a lawyer-driven settlement. Accordingly, the settlement must be rejected under Rule 23(e). If the Court decides to approve the settlement, any attorneys' fee award should be made after the cash-election and value-certificate redemption rates are known.

Dated: November 28, 2016                          Respectfully submitted,

Anna St. John (*pro hac vice* pending)             */s/ Eric M. Lightman*
**COMPETITIVE ENTERPRISE INSTITUTE**              Eric M. Lightman (SBN 288791)
  **CENTER FOR CLASS ACTION FAIRNESS**            **Law Offices of Eric M. Lightman**
1310 L St. NW, 7th Floor                          1254 Mission Street
Washington, DC 20005                              San Francisco, CA
Telephone: (917) 327-2392                         Telephone: (415) 295-4777
Email: anna.stjohn@cei.org                        Email: eric.m.lightman@gmail.com

*Attorneys for Objector Joshua D. Holyoak*

I, Joshua D. Holyoak, personally attest that I have fully reviewed and endorse the Objection.

DATED: November 28, 2016

Dr. Joshua D. Holyoak
*Objector*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing Objection using the CM/ECF filing system thus effectuating service of such filing on all ECF registered attorneys in this case. I further certify that, in accordance with the class notice, I caused the foregoing document to be sent via first class mail to the following addresses listed below:

| | |
|---|---|
| Clerk of the Court<br>USDC, Northern District of California<br>280 South 1st Street, Room 2112<br>San Jose, CA 95113 | Roger N. Heller, Esq.<br>Lieff Cabraser Heimann & Bernstein LLP<br>275 Battery Street, 29th Floor<br>San Francisco, CA 94111 |
| Eli Schlam, Esq.<br>Williams & Connolly LLP<br>725 12th Street, NW<br>Washington, DC 20005 | |

DATED this 28th day of November, 2016.

*/s/ Eric M. Lightman*

Eric M. Lightman

OBJECTION OF JOSHUA D. HOLYOAK